Randolph C. HACKFORD, Lawanna Kay Reed Thompson, Alen D. Reylos and Oranna Bumgarner Moosman, for themselves and on behalf of all other persons similarly situated, Plaintiffs,

v.

FIRST SECURITY BANK OF UTAH, N. A., Defendant.

Civ. No. C 75–278.

United States District Court, D. Utah, C. D.

March 6, 1981.

Parker M. Nielson, Paul T. Moxley, Fabian & Clendenin, Salt Lake City, Utah, for plaintiffs.

Thomas A. Quinn and James S. Jardine, Ray, Quinney & Nebeker, Salt Lake City, Utah, for defendant.

## MEMORANDUM OPINION

JENKINS, District Judge.

This action was filed July 17, 1975. An order was entered March 24, 1977 for the maintenance of the action as a class action.

The matter was tried to the Court with trial ending December 4, 1979.

Oral argument was heard January 3, 1980. Briefs and supplemental briefs and communications were filed with the Court, the last of such being filed December 9, 1980.

The matter is now ripe for decision.

## I. FACTS

Plaintiffs claim that the defendant, First Security Bank of Utah (Bank) violated pro-

---

**1.** 48 Stat. 881, 15 U.S.C. § 78a *et seq.*

**2.** 68 Stat. 868, 25 U.S.C. § 677 *et seq.*

---

visions of the Securities Exchange Act of 1934,[1] and breached its state statutory and common law fiduciary duties when in 1960–61 it sold certain shares of stock held by it as trustee and facilitated the sale of similar shares held by others to the Ute Indian Tribe. The case was tried to the court, the undersigned, the third judge to consider the matter. The relevant facts are as follows:

In 1954 Congress passed the Ute Indian Supervision Termination Act.[2] That Act classified as "mixed-bloods" all members of the Ute Indian Tribe of the Uintah and Ouray Reservation who did not possess at least one-half Ute Indian ancestry and in excess of one-half Indian ancestry.[3] There were then 490 "mixed-bloods". The remaining members of the tribe were deemed "full-bloods". The purpose of the Act was stated as follows:

§ 677. Purpose

The purpose of sections 677–677aa of this title is to provide for the partition and distribution of the assets of the Ute Indian Tribe of the Uintah and Ouray Reservation in Utah between the mixed-blood and full-blood members thereof; for the termination of Federal supervision over the trust, and restricted property, of the mixed-blood members of said tribe; and for a development program for the full-blood members thereof, to assist them in preparing for termination of Federal supervision over their property. Aug. 27, 1954, c. 1009, § 1, 68 Stat. 868.

To that end, the Act required that representatives of the two groups, the "mixed-bloods" and the "full-bloods", divide the tribal assets between them. The representative of the mixed-blood group was the Affiliated Ute Citizens of the State of Utah (AUC) an association made up of the individual mixed-bloods. The representative of the full-bloods was the Tribal Business Committee.

---

**3.** Members of the Ute Tribe could become mixed-bloods by choice irrespective of their ancestry.

After the division of the tribal assets, the group of mixed-bloods was required to devise a plan for the distribution of its share of the tribal assets to the individual members of the mixed-blood group and to carry out the plan. For the ten year period following the Congressional enactment, no mixed-blood could dispose of his interest in any real property obtained by him in the distribution of mixed-blood assets without *first* offering it to the other members of the tribe, i. e. mixed-bloods and full-bloods, in a form approved by the Secretary of Interior. The Secretary was directed by the Act to protect the interests of those mixed-bloods who were minors, *non compos mentis,* or in his opinion, otherwise in need of assistance. Federal supervision of the mixed-bloods was terminated on August 27, 1961. The restrictions on the disposition of real property by mixed-bloods continued until August 27, 1964. When the tribal assets were divided,[4] among other things, the members of the mixed-blood group received 172,000 acres of range land. In 1958, as part of the plan for distributing the mixed-blood group's share of the assets to its individual members, the mixed-blood group formed two non-profit grazing corporations under the laws of Utah: The Rock Creek Cattle Corporation (Cattle Company) and the Antelope Sheep Range Corporation (Sheep Company). Of the 172,000 acres of range lands, 44,000 acres were allotted to the Cattle Company and 128,000 to the Sheep Company. Each mixed-blood then surrendered his undivided interest in the range land allotted to the Cattle Company and in return received the right to one share of Cattle Company stock. The same procedure was followed for the Sheep Company. Thereafter the United States issued patents conveying the respective portions of the range land directly to the corporations, and Range Company shares were then issued to the individual mixed-bloods or to the defendant trustee Bank. The two shares, a share in each of the range corporations, were commonly referred to as a unit.

A share in the Sheep Company entitled its holder to graze five sheep upon the summer range for six months during grazing season, and five sheep upon the winter range for six months during the winter grazing season. Holders of Cattle Company stock were entitled to graze five head of cattle for six months during a normal year for each two shares of stock held. The Articles of Incorporation of each of the range corporations declared the corporate purpose to be the maintenance of a range for grazing, and incidentally thereto, to "construct, operate and maintain fences, corrals, sheds, barns and other fixtures .." In addition, each of the articles states that the corporation is to be non-profit and that at least 85% of its income is to be "derived from assessments collected from the stockholders and shall be used for the sole purpose of meeting such expenses or losses that may be incurred by the corporation." The articles of incorporation of each range company designated the Bank as transfer agent of the shares.

The Secretary of Interior, pursuant to his duty under the Termination Act to protect the interests of minors and *non compos mentis,* appointed the Bank as trustee of the assets of 174 mixed-bloods identified by the Superintendent of the Uintah and Ouray Agency of the Bureau of Indian Affairs. Of these 174, 162 were minors. The trust agreement, executed in July of 1960, gave

---

4. 25 U.S.C. § 677i provides in part as follows: "The tribal business committee representing the full-blood group, and the authorized representatives of the mixed-blood group, within sixty days after the publication of the final membership roll, as provided in § 677g of this title, shall commence a division of the assets of the tribe that are then susceptible to equitable and practicable distribution. Such division shall be by agreement between them subject to the approval of the Secretary. Said division shall be based upon the relative number of persons comprising the final membership roll of each group. After such division the rights or beneficial interests in tribal property of each mixed-blood person whose name appears on the roll shall constitute an undivided interest in and to such property which may be inherited or bequeathed, but shall be subject to alienation or encumbrance before the transfer of title to such tribal property only as provided in §§ 677–677aa of this title. Any contract made in violation of this section shall be null and void. xxx xxx."

the Bank sole discretion to manage the assets of the trust estate in the best interests of the beneficiaries. By virtue of such agreement, the Bank held the range corporation shares of each of the 174 beneficiaries in trust for the use and benefit of each such persons.

Although it was not until October of 1960 that the stock certificates in the range corporation were physically issued, many of the adult mixed-bloods traded in the shares representing grazing rights soon after the range companies were formed in 1958. These so-called "private treaties" or contracts of purchase and sale resulted, in part, from the B.I.A. and John Boyden emphasizing to the mixed-bloods that those mixed-bloods who wished to engage in the livestock business in any meaningful way should acquire additional grazing rights shares from those mixed-bloods who desired to sell their shares. Many mixed-bloods traded in their anticipated shares,[5] even though the Termination Act and the articles of the range corporations initially limited the market by requiring sale to be made to mixed-bloods or to full-blood members of the tribe[6] in a manner approved by the Secretary of Interior. The "private treaties" occurred prior to the Secretary of Interior's promulgation of regulations regarding sale of the range company shares, and were ineffective absent the prescribed offer to qualified purchasers.[7]

In the spring of 1960, the full-bloods became interested in acquiring stock in the range corporations. In a letter dated March 31, 1961, the Chairman of the Tribal Business Committee informed the Commissioner of Indian Affairs that the A.U.C. and the Committee had met and discussed the possibility of purchasing shares of the range corporations for their appraised value. The Commissioner responded in a letter dated June 16, 1960 that his office would approve the expenditure of tribal funds for such purchase only if the full-bloods could acquire a controlling interest.

On August 5, 1960, the Secretary promulgated regulations, providing policies and procedures governing the disposition of certain assets by mixed-bloods.[8] The regula-

---

5. It appears that between 100 and 150 mixed-bloods sold their stock by "private treaty". Those sales of which record is available indicate that the sale prices ranged for $100 to $650 per unit, i. e. one share of each corporation.

6. Section 15 of the Termination Act states in relevant part:

In the event a member of the mixed-blood group determines to dispose of his interest in said real property at any time within ten years from the date of enactment of this Act, he shall first offer it to members of the tribe, and no sale of any interest, prior to termination of Federal supervision shall be authorized without such offer to said members of the tribe in such form as may be approved by the Secretary.

Section 5 of the Termination Act states that after the publication of the final roll, the tribe "shall thereafter consist exclusively of full-blood members." The Office of the Solicitor of the Department of Interior was requested by the Commissioners of the B.I.A. to interpret the term "tribe" as used in Section 15, apparently because of some confusion as to whether the mixed-bloods were required to offer their interests in real property only to the full-blood members, or to both the full-blood and mixed-blood members. The Solicitor's Office interpreted the term "tribe" to include both for purposes of Section 15. This opinion is reflected in the Articles of Incorporation of the range corporations, which require an offer "to the members of the tribe, including the mixed-blood and full-blood members thereof" prior to a shareholder's sale of the stock.

7. Many of those who had purchased rights by "private treaty" submitted forms to the Superintendent memorializing the transactions and requesting his approval. The Superintendent did so in many cases. After he had been replaced, he explained his reasons for doing so to the Area Director in a letter dated August 10, 1960.

[My approval] was requested in order to strengthen their position in getting the seller at a later date to actually endorse the stock certificates over to the purchaser. My approval was an accommodation to the purchaser in this respect only and was not to be construed as an approval of the sale price .... It was explained that the regulations covering the movement of the stock had not as yet been promulgated and approved, and a reverse action by the operation of the regulations as approved by the Secretary of Interior could happen in this instance.

8. 25 C.F.R. § 243.

tions became effective September 11, 1960, and required stockholders in the range corporations who wished to dispose of their stock to offer the stock first to the remaining mixed-bloods and the full-bloods in a prescribed manner.[9] There was no provision for the type of "private treaties" that had emerged during the time prior to the issuance of the regulations.[10]

On August 12, 1960, Area Director F. M. Haverland, wrote to the Commissioner of the B.I.A. concerning the requirement that the full-bloods purchase a majority of the stock if tribal funds were to be used. He notes that the regulations issued by the Secretary required the range company stock, if offered, be offered to the "members of the tribe" and that a "member of the tribe" was defined in the regulations to include "all mixed-blood and full-blood members". He further noted that the regulations defined "tribe" as the Ute Indian Tribe. It was his interpretation of these definitions that the "tribe" was the full-bloods represented by the Tribal Business Committee.[11] The tribe was not a "member of the tribe" and thus could not initially purchase range company shares but could purchase only after an offer had been made to individual mixed-bloods and individual full-bloods. Thus, the letter expressed his concern that the tribe of full-bloods would

be unable to obtain a majority of the shares of stock. It was his further concern that if the "tribe" fell within the definition of "member of the tribe" by regulation such was in his opinion not authorized by the Termination Act.

On August 16, 1960, John Boyden, having received word of Area Director Haverland's August 12 letter, wrote to the Commissioner alerting him to the existence of schemes by non-Indians to acquire the range land and urging him to either amend or interpret the regulations so as to permit the tribe to accept offers of sale of range company shares or the land [12] held by the range companies. On August 17, Area Director Haverland again wrote to the Commissioner and informed him of the existence of the private treaties and the ongoing concern of those mixed-bloods who had purchased grazing company shares by "private treaty" when they learned that the Ute Tribe (full-bloods) was interested in purchasing shares in the range corporations.[13] Many of these private treaty purchasers had retained counsel to assist them in protecting their interests in the shares which they had purchased. In view of this potential problem, the Area Director proposed that the Commissioner void all private treaty transactions in the range company shares which took place prior to the issuance of the regu-

9. The prescribed manner included the following: (1) The seller notified the Superintendent of his desire to sell and his terms (§ 243.5); (2) The Superintendent notified the range corporations and the Tribal Business Committee of the offer, and posted it (§ 243.6); (3) Upon acceptance by two or more members, the Superintendent was to call for sealed bids from them and the sale made to the highest bidder bidding in excess of the offering price (§ 243.7); (4) If the offer was not accepted by a member of the tribe, the offeror had six months to sell the shares to any person at a price greater than or equal to the offering price before he had to re-offer it to the members of the tribe (§§ 243.7, 243.8).

10. In a letter to the Commissioner of the B.I.A. dated December 16, 1959, the Area Director recommended that the regulations include a provision authorizing "private treaties". The Commissioner, responded by letter of August 16, 1960, after the regulations had been adopted, and informed the Area Director that although his recommendation had been con-

sidered, the Termination Act did not contemplate "private treaties".

11. Although the regulations defined "tribe" as the Ute Indian Tribe, and "member of the tribe" as "all mixed-blood and full-blood members", it is clear that the term "tribe" as used in the Act referred only to the full-bloods collectively. *See* n.6, supra.

12. At that time, the A.U.C. was considering the possibility of dissolving the range corporations and selling the land to the tribe. On June 27, 1960, the A.U.C. Board of Directors circulated a letter directed to all of the mixed-bloods informing them that the tribe had received authority to purchase the land or stock in the range corporations. The letter inquired whether the members would be willing to sell to the tribe and enclosed a ballot by which they could express their preference.

13. See note 12, *supra*.

lations and which had not conformed to the procedure provided in the regulations.

On August 24, 1960, the Department of Interior sent a telegram to Area Director Haverland informing him (1) that the Ute Indian Tribe was a "member of the tribe" for purposes of the offer requirements,[14] and (2) that the private treaties entered into prior to the issuance of the regulations and which did not conform to the required procedures were invalid. The telegram also informed the Area Director that concerning his August 12 letter to the Commissioner "We (B.I.A.) do not share your apparent concern regarding reported purchases for outcome of any possible suit."

The Area Director again wrote the Commissioner on September 2, 1960 and recommended that the B.I.A. relax the requirement that the tribe, if it purchased stock, purchase a majority. The Area Director foresaw no possible way for the tribe to assure itself of a majority of shares under the regulations. The next best thing, in his view, was to allow the tribe to purchase the block of stock held in trust by the Bank, which would give it 170 of the 246 shares needed to obtain a majority.[15] The Commissioner adopted the recommendation of the Area Director, and in a letter dated September 27, 1960, informed the Tribal Business Committee that it could bid on the stock held by the Bank.

On September 12, 1960, the full-bloods, represented by the Tribal Business Committee authorized John Boyden, its attorney and Rex Curry, its Executive Secretary, to offer the Bank $1,100 a unit, i. e. for 1 share in each of the two range corporations. A meeting of the Bank's Trust Committee was convened the next day, September 13, 1960, and Messrs. Boyden and Curry submitted the proposal. They informed the Trust Committee that the full-bloods were interested in obtaining a majority of the shares in each of the range corporations. The $1,100 figure submitted was clearly based upon the so-called "Moore appraisal".

The "Moore appraisal" was conducted in 1958 by Frank Moore, an appraiser selected by the Bureau of Indian Affairs and employed by the AUC to perform an appraisal on certain tribal range land, including the land which eventually went into the range corporations. In 1958, the Moore appraisal valued the land which went into the range corporations at $492,000. Thus, the book value of each share of range company stock amounted to about $500 or $1,000 a unit.

After the Trust Committee meeting at which the representatives of the full-bloods appeared, unrebutted evidence at trial reveals that the Bank circulated questionnaires to 116 of the trust beneficiaries or their parents asking them if they desired to sell their stock to the full-bloods for $1,100 a unit. Of those contacted, 84 indicated a desire that the stock be sold, 25 indicated a desire that it not be sold. On September 23, 1960, ten days after receiving the full-bloods' proposal, the Bank, as Trustee, offered to sell 147 units of the stock it held to the Ute Indian Tribe (full-bloods) at not less than $1,100 per unit. The units offered were those where the beneficial owner or parent had not expressly asked that the shares be retained. The offer was made by trustee Bank subject to (1) a right to repurchase a maximum of 15 units at $1,100 a unit within five years from the sale, (2) a continuing offer of the purchaser to purchase additional units, not to exceed 23, at $1,100 per unit for a period of five years, and (3) in the event that the tribe purchased the shares, a right in the beneficial owner of the shares sold, to purchase lifetime hunting and fishing permits on the entire Ute Indian Reservation for the sum of $60 upon the same terms and conditions as such permits were sold to the public. Under the regulations, the offer was made

14. The telegram disclosed that the stated rationale for this interpretation was the fact that the regulations required the Superintendent to notify the Tribal Business Committee of all mixed-blood offers to sell the range company shares. See note 9, *supra.*

15. In his earlier letter of August 17, the Area Director had informed the Commissioner that it was the opinion of John Boyden that the Bank would be willing to sell to the tribe the shares it held in trust.

to the individual mixed-bloods and full-bloods, as well as to the tribe. The offer was accepted by the tribe on October 14, 1960, and by one Margaret Sprouse, a mixed-blood, on October 17, 1960, the last day that acceptances could be made.

On October 18, 1960, the tribe (full-bloods) sent a letter to the Superintendent protesting the acceptance by Margaret Sprouse, claiming that she represented non-Indian interests. John Boyden discussed the matter with the Area Director and urged an investigation by him or permission to furnish information to him which would demonstrate that Mrs. Sprouse was acting in behalf of non-Indian and thus non-qualified purchasers. On October 25, 1960, the Area Director wrote to the Commissioner recommending that the Department of Interior institute an investigation to determine whether Mrs. Sprouse's acceptance conformed to regulations. By copy of this letter, the Area Director instructed the Superintendent to notify the tribe and Mrs. Sprouse that the opening of the sealed bids scheduled for November 3, was to be postponed until November 17. The Area Director complied on October 28. On October 29, 1960, Mrs. Sprouse brought suit in the United States District Court for the District of Utah seeking an order temporarily restraining the Superintendent from permitting the tribe or any individual full-blood to accept any offer made to sell shares in the range corporations, and seeking an adjudication that the Termination Act did not authorize the sale of the range company shares to the full-bloods individually, or collectively as the tribe. The court that day restrained all sales activity in the shares. The Federal Bureau of Investigation investigated the circumstances surrounding Mrs. Sprouse's offer. Based upon that investigation, and upon testimony given at a hearing

held before the district court in the Sprouse action, the Department of Interior concluded that Mrs. Sprouse was not acting in her own behalf in seeking to purchase shares in the range corporations. By letter dated January 19, 1961, the Department notified the Area Director of its conclusion, and instructed him to proceed with purchase by the tribe. On March 6, 1961, the district court held that the full-bloods individually, and the tribe could accept offers to sell the shares and lifted the restraining order. On March 9, 1961, the Superintendent mailed a check to the Bank representing full payment by the tribe, the only remaining acceptor of the Bank's offer, for the 147 units held by the trustee Bank.

During this time, the adult mixed-bloods had been offering their individual shares for sale at book value and above. Only Mrs. Sprouse and the tribe accepted any of these individual offers. After the Department of Interior invalidated the acceptances of Mrs. Sprouse, she apparently accepted no more offers. Thereafter, only the tribe purchased shares in the range corporations. The price remained at $1,100 per unit. By May 3, 1963, the tribe had purchased all but 48 range corporations units of which 19 units were still held by the Bank in trust. John Boyden thereafter informed the trustee Bank of the tribe's plan to dissolve the range corporations. The corporations were eventually dissolved and the 39 [16] mixed-bloods whose shares had not been sold to the tribe received individual interests in grazing land.[17]

It is the contention of the plaintiffs that the trustee Bank's sale of the stock to the tribe, and its facilitation of sales by others to the tribe contravened the interests of the mixed-bloods and were unlawful. The plaintiffs, in representing a class of mixed-

---

**16.** Of these 34, 16 were yet trust beneficiaries. After the initial block sale, the Bank held stock for 27 beneficiaries. The record does not disclose in all instances what occurred with respect to the other 11 shares. At least some of the 27 beneficiaries attained their majority between the time of the block sale and the time the corporations were dissolved. There is no evidence that, after the initial sale, the Bank

sold any shares without the permission of the beneficiary or of his parents.

**17.** As a result of these distributions, 28 mixed-bloods received an undivided interest in approximately 14,000 acres of range land, nine received an individual interest 1,520 acres, and two shares 520 acres.

bloods comprising all trust beneficiaries whose stock was sold to the Ute Tribe, allege that the Bank violated Section 10(b) of the Securities and Exchange Act of 1934,[18] Rule 10b–5 [19] promulgated thereunder, and its state statutory [20] and common law fiduciary duty to the beneficiaries.[21] The plaintiffs also purport to represent a class comprising all mixed-bloods who sold their stock to the tribe, and allege that the Bank had and breached a fiduciary duty to them and aided, abetted, and conspired with others to defraud them in violation of Rule 10b–5.

## II. CLAIMS OF THE TRUST BENEFICIARIES

### A. Federal Securities Law Claims

■ The Bank contends that the plaintiff trust beneficiaries lack standing to bring this action under Rule 10b–5. The trustee Bank, not the beneficiaries, sold the stock to the Ute Tribe. Therefore, the Bank argues, the beneficiaries were neither the "purchasers" nor the "sellers" to which Rule 10b–5 standing was limited by the United States Supreme Court in *Blue Chip Stamps v. Manor Drug Stores, Inc.*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). It is not correct that to find that the trust beneficiaries have standing to sue under the Rule would run contrary to the policy underpinnings of *Blue Chip's* "purchaser or seller" requirement, or would realize the fears which prompted the court to adopt it. Briefly stated, the concern of the *Blue Chip* Court was, that in the absence of the limitation, bystanders to the securities markets would be availed of an opportunity, without risk and with the benefit of hindsight to initiate "strike" or nuisance litigation when predictions and performance failed to coincide. And, since the outcome of such suits would normally turn on the speculative finding of whether the plaintiff "would

have purchased", or "would have sold" but for the alleged misrepresentation or failure to disclose, summary disposition of these suits would be rare and settlement *in terrorem*, frequent. Those concerns do not come to the fore in this instance. While the trust beneficiaries did not perform the mechanics of the sale of their stock, they were not the bystanders contemplated by *Blue Chip*. They are separate from the public at-large. It was stock in which they had a beneficial interest which was sold. If any fraud occurred as to them, it was they who would feel the impact, not the trustee "seller". While the court is aware of some case authority to the contrary, *see e. g. Schoenbaum v. Firstbrook,* 405 F.2d 200, 213, *rev'd. en banc,* 405 F.2d 215 (2nd Cir. 1968) *cert. denied,* 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969), *Lincoln National Bank v. Lampe,* 414 F.Supp. 1270 (N.D.Ill.1976), *Rippey v. Denver United States National Bank,* 273 F.Supp. 718 (D.Colo.1967), it is unwilling to extend, or apply, as the case may be, the holding of *Blue Chip* to deny plaintiffs standing in this case. *See Kirshner v. United States,* 603 F.2d 234 (2nd Cir. 1978); *Klamberg v. Roth,* 425 F.Supp. 440 (S.D.N.Y.1976); *Heyman v. Heyman,* 356 F.Supp. 958 (S.D.N.Y.1973).

To say the trust beneficiaries have standing is not to say they have stated a cause of action under Rule 10b–5. It is undisputed that under the terms of the trust agreement, the Bank, as trustee, was under no obligation to inform, or seek the advice of or concurrence of the trust beneficiaries prior to a sale of the trust assets. Further, the agreement contemplates that it could be "amended, modified or supplemented" and I assume terminated, only "by the District Court [of the State of Utah, Duchesne County] upon application by the trustee, a beneficiary or on the court's own motion

---

**18.** 15 U.S.C. § 78j(b).

**19.** 17 C.F.R. § 240.10b–5.

**20.** Section 33–2–2, Utah Code Ann. (1953) requires fiduciaries to act prudently in administering the property of others.

**21.** Plaintiffs also claim that the Bank's actions violated certain regulations promulgated by the Comptroller of the Currency pursuant to 12 U.S.C. § 92a, and the Utah Uniform Securities Act. The plaintiffs have argued neither of these claims and they will not be considered.

with due notice by publication to beneficiaries ..." Consequently, any misrepresentation or omission on the part of the Bank would have, in the first instance, been material only to the decision of a beneficiary to apply to the State District Court for relief. Stated another way, the necessary, although unarticulated claim of the trust beneficiaries, is that but for the alleged misrepresentations and omissions of the Bank, they would have successfully petitioned the District Court to terminate the trust and thereafter refused the offer of the Ute Tribe and retained the range company stock.

In *Santa Fe Industries v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), the Supreme Court held that a breach of fiduciary duty by majority stockholders, alone, without deception, did not violate Rule 10b–5. The action in *Santa Fe* involved a corporation's minority stockholders who had been forced by a 95 per cent stockholder to sell their shares back to the corporation at a price set by the board of directors. A Delaware short-form merger statute permitted the squeeze subject only to the minority shareholder's right to challenge the price in court. It was undisputed that the majority shareholder had in all respects, complied with the statute. Notification of the merger, received the day after it became effective, was accompanied by the independent appraisals of the company's assets and its stock upon which the price offered was based. The minority did not avail themselves of this statutory right of appraisal, but instituted an action in federal court alleging that the price paid was unfair and in violation of Rule 10b–5. They also alleged that the majority shareholder's failure to notify them in advance of the merger, although not required by Delaware law, was a material non-disclosure and also violative of the Rule. The Supreme Court, based upon the district court's finding that the documents supplied the minority shareholders contained no material misrepresentation or omission, but provided all the information relevant to their decision whether or not to seek review, held that even if the price set was unfair and reflected a breach of fiduciary duty, such was not actionable under Rule 10b–5. Specifically, the court concluded that "deception" or "manipulation" are essential elements of an action under the Rule, and refused to imply a cause of action based upon unfairness alone—conduct not violative of the "fundamental purpose" of the Act and which is "traditionally left to state regulation". *Id.* at 478, 97 S.Ct. at 1303. In short, the federal interest is in *disclosure*. As to plaintiffs' claim that the majority shareholder's failure to provide them with advance notice constituted a material non-disclosure violative of the Rule, the Court held in a footnote [1] that since the plaintiffs could have done nothing to impede the transaction, the failure to provide early disclosure was not material.

■ *Santa Fe* has application here. *Santa Fe* teaches that this court under and limited to 10b–5 need not examine the fairness of the sale of the range corporation stock, i. e. whether it was in the best interests of the beneficiary. Rather, the appropriate question is whether there was some material deception, in this case non-disclosure. If it is assumed that the trustee Bank failed to disclose to the beneficiaries facts which would have prompted them to terminate the trust and recover the stock, it is arguable that such a non-disclosure would have been material. The holding in footnote 14 of the *Santa Fe* opinion makes it reasonably clear that a non-disclosure may be actionable under the Rule even if not immediately material to the investment decision.

In situations of corporate self-dealing in securities involving breach of majority shareholders of the fiduciary duty owed the corporation, the situation alleged in *Santa Fe*, minority shareholders, if aware that such a breach is imminent, normally have no power to prevent it and thus no investment decision save the decision to bring a derivative action. Nonetheless, the *Santa*

---

**1.** 430 U.S. at 474, n. 14, 97 S.Ct. at 1301, n. 14.

*Fe* court recognized that an omission may be material in such a setting if the information concealed would have been significant to a minority shareholder's decision to seek state court relief from an impending securities transaction, even though their approval of the transaction was not required.[2] In this sense, an omission may be material only if a state-law remedy is available. Unlike the minority shareholders in *Santa Fe*, plaintiffs had such a remedy available to them, at least under the terms of the trust agreement. However, implicit in the *Santa*

*Fe* Court's recognition of this material information once-removed is that Rule 10b–5 imposes upon majority shareholders the duty to disclose it to the minority.[3] In my view, the Rule imposes no analogous duty upon the Bank, as trustee, here. The import of *Santa Fe* is not that a duty to disclose arises from the existence of a state-law remedy. Rather, the Rule imposes it in situations where the failure to disclose would result in deception. The duty to disclose apparently recognized in *Santa Fe* has its doctrinal underpinnings,[4] but those

**2.** 430 U.S. at 474 footnote 14, 97 S.Ct. at 1301 footnote 14 appeared as follows: In addition to their principal argument that the complaint alleges a fraud under clauses (a) and (c) of Rule 10b–5, respondents also argue that the complaint alleges nondisclosure and misrepresentation in violation of clause (b) of the Rule. Their major contention in this respect is that the majority stockholder's failure to give the minority advance notice of the merger was a material nondisclosure, even though the Delaware shortform merger statute does not require such notice. Brief for Respondents 27. But respondents do not indicate how they might have acted differently had they had prior notice of the merger. Indeed, they accept the conclusion of both courts below that under Delaware law they could not have enjoined the merger because an appraisal proceeding is their sole remedy in the Delaware courts for any alleged unfairness in the terms of the merger. Thus, the failure to give advance notice was not a material nondisclosure within the meaning of the statute or the Rule. [citation omitted]

Arguably, footnote 14 requires plaintiffs to allege, as part of their cause of action under Rule 10b–5, what action they would have undertaken but for the nondisclosure. They have not done this.

**3.** While the existence of this duty seems to be the logical inference to be drawn from the *Santa Fe* Court's analysis of the plaintiffs' claim based on the failure to receive advance notice, it is somewhat difficult to reconcile with the Court's reluctance, expressed later in the opinion, to "federalize the substantial portion of the law of corporations that deals with transactions in securities." 430 U.S. at 479, 97 S.Ct. at 1304. In *Santa Fe*, the majority shareholder's decision to squeeze out the minority, in and of itself, was not enjoinable under Delaware law because it was authorized and thus "fair" under Delaware law. However, seemingly all state courts could enjoin action on the part of majority shareholders unfair under state law. Since few self dealers announce their ill intentions in advance, and thus few minority shareholders will be given an opportunity to seek preliminary relief in state court, a breach of state law fiduciary duty involving securities will almost always contain an element of actionable Rule 10b–5 deception under *Santa Fe*. See *Goldberg v. Meridor*, 567 F.2d 209, 225 (2nd Cir. 1977), (Meskill, J., dissenting) *cert. denied*, 434 U.S. 1069, 98 S.Ct. 1249, 55 L.Ed.2d 771 (1978). Nonetheless, it appears that only the forum, not the substantive law of corporations, would be thus federalized. Footnote 14 has stimulated considerable controversy in the federal courts. *Compare Biesenbach v. Guenther*, 588 F.2d 400, 402 (3rd Cir. 1978) *and Kerrigan v. Merrill, Lynch, Pierce, Fenner & Smith*, 450 F.Supp. 639, 644 (S.D.N.Y.1978), *with Healey v. Catalyst Recovery of Pennsylvania, Inc.*, 616 F.2d 641, 646 (3rd Cir. 1980) *and Klamberg v. Roth*, 473 F.Supp. 544, 551 (S.D.N.Y.1979). *See also Kidwell Ex Rel. Penfold v. Meikle*, 597 F.2d 1273 (9th Cir. 1979); *Goldberg v. Meridor, supra; Wright v. Heizer Corp.*, 560 F.2d 236 (7th Cir. 1977), *cert. denied*, 434 U.S. 1066, 98 S.Ct. 1243, 55 L.Ed.2d 767 (1978). Among the three last cited cases, *Goldberg* required advance disclosure of a transaction to minority shareholders if the transaction was enjoinable in state court; *Kidwell* and *Wright* require a plaintiff to show that his request for an injunction in state court would have been successful.

**4.** A corporation can act only through its agents, normally directors. Generally, the fiduciary duty owed to a corporation by its directors extends beyond the duty to avoid self dealing, but requires that a director fully disclose to the corporation, normally personified in the other directors, all facts known to him which are noticed for a transaction. 3 W. Fletcher, Cyclopedia of the Law of Private Corporations §§ 790 at 12, 808 at 56 (rev. perm. ed. 1975). Only then can a corporation, through its board, act in its own best interests. Under agency law principles, the knowledge of the directors is imputed to the corporation. However, agency law does not extend this fiction to instances in which a director acts in conflict with the corporations interest, 3 W. Fletcher

aside, minority shareholders are different from the minor trust beneficiaries here. Those in control of a corporation are rarely there by virtue of a trust placed in them by minority shareholders incapable of perceiving the corporation's interest, but because of the magnitude of their investment. The trustee here was intentionally given control, indeed the sole discretion to act, because of the perceived, and probably real, inability of the minors to act in their own interest. Even the law imparts a disability to minors and limits their ability to bring actions in their own behalf.[5] It makes little sense to impose upon the trustee, here, a duty to disclose the nature of its actions to minors from whom the decision-making ability has been intentionally removed. Moreover, under the terms of the trust agreement, the beneficiaries, unlike minority shareholders, had no expectation that the Bank would inform them in advance of its actions. Consequently, it is difficult to conceive that a failure to disclose would have deceived them. In short, if *Santa Fe* imposed a duty upon majority shareholders to disclose to minority shareholders information material to the latter to litigate, I refuse to extend it to the trustee Bank here. *See O'Brien v. Continental Illinois National Bank and Trust*, 593 F.2d 54 (7th Cir. 1979).

§ 819, *supra*. Thus, it is not too abstract to speak in terms of deceiving the corporation. In those situations, courts have deemed the minority shareholders representatives of the corporation's capacity to be deceived. *See e. g. Schoenbaum v. Firstbrook*, 405 F.2d 215, 220 (2nd Cir. 1968) (*en banc*) (adopting the position taken by Judge Hays' dissenting opinion in the earlier panel decision in *Schoenbaum v. Firstbrook*, 405 F.2d 200, 214 (2nd Cir. 1968). *See generally*, Note, *Suits for Breach of Fiduciary Duty Under Rule 10b–5 After Santa Fe Industries, Inc. v. Green*, 91 Harv.L.Rev. 1874, 1882–83 (1978).

**5.** Rule 17(b), Utah Rules of Civil Procedure: Rule 17(c), Federal Rules of Civil Procedure.

**6.** Plaintiffs, throughout this case, do not really characterize the alleged failures of the Bank in terms of disclosure. For instance, the only allegation in the complaint that can be construed as alleging a failure to disclose is the claim that the Bank "knew that the plaintiffs ... were unaware that [they] would be denied their historical hunting and fishing and water

■ Nonetheless, even if the Bank had a duty to disclose its intentions in advance in order to avail the beneficiaries of a decision to pursue their state court remedy, there is no evidence that such a duty was breached. Prior to the Bank's sale of the stock, 116 of the trust beneficiaries of their parents were contacted, either by or through the Bank, as to their wishes relative to the sale of their stock to the Ute Tribe. Most, if not all, of these contacts took the form of a questionnaire which disclosed that the Ute Tribe would be the purchaser and was willing to pay $1,100 for each "unit" consisting of one share of stock in each of the range corporations. Of these 116, approximately 80 beneficiaries or their parents indicated their desire that the stock be sold to the Ute Tribe. Approximately 25 indicated the contrary, and the Bank did not sell the stock of those beneficiaries. Apparently the Bank sold as well all of the stock held for those beneficiaries not contacted. The major contentions of the plaintiffs are that the Bank acted in the interest of the Ute Tribe and sold the stock for too low a price.[6] As to those beneficiaries contacted, the Bank's disclosure of the price and the purchaser provided them sufficient information upon which to base their decision to sell. If they thought the price was too low,[7] or were fearful of

rights" if their stock was sold. See 559–560 *infra* for a discussion of these claims. Moreover, in plaintiffs' lengthy trial memorandum and post-trial memoranda, no specific instances of nondisclosure are claimed. In fact, plaintiffs' trial memorandum characterizes the Bank's circulation of the questionnaires containing information concerning the sale of the stock to the Tribe as "a consideration of doubtful relevance considering [the minor's] known limited abilities which was the purpose of the trust in the first place." Plaintiffs Trial Memorandum at 58.

**7.** It is clear from the facts of the case that the $1,100 figure had as its basis the Moore appraisal of the range land from which a price of $1,000 per unit had been calculated. The Moore appraisal had been commissioned and paid for by the mixed-blood group and, after it had been completed, was explained to many of them at a general membership meeting. Copies of it were apparently available. Consequently, the beneficiaries had available to them a reference from which to ascertain the advisa-

the prospect of the Ute Tribe gaining control of the range corporations,[8] their choice was clear. As to them, there was no deception and consequently no Rule 10b–5 cause of action under the holding of *Santa Fe.* The record does not disclose why the remaining beneficiaries were not contacted. Plaintiffs have not attempted to identify them and have not alleged that they or any of them were unaware of the Bank's intentions. The court cannot assume that they were unaware when the Board of Director's of the Affiliated Ute Citizens[9] and 116 of the 174 trust beneficiaries knew that the Bank was considering the sale. As the prospective sale pended, they could have notified the Bank of their desire not to have the stock sold, or to seek legal redress. Although the Bank offered to sell the 147 shares in September of 1960, it was not until March of 1961 that the sale was completed. In the interim, the Bank forwarded a copy of the offer to Martin Zollar, Superintendent of the Uintah and Ouray Reservations. Martin Zollar notified both range corporations, the Ute Distribution Corporation and the Bureau of Indian Affairs of the offer; the offer was posted;[10] Margaret Sprouse, an adult mixed-blood, accepted the offer as did the Ute Tribe. Mrs. Sprouse brought an action in federal court seeking to enjoin the Ute Tribe from accepting the Bank's offer; and the court held a hearing and dismissed the action. In view of the above, and the fact that the Bank honored the requests of those beneficiaries contacted who did not wish their stock sold, it is difficult to infer from the Bank's failure to contact some of the beneficiaries an attempt to conceal relevant information from them. That information was certainly available, if not directly communicated by the Bank in all instances. In the absence of evidence that specific beneficiaries not contacted did not know that their stock was about to be sold, I cannot conclude that they were deceived as they must be in order to state a claim under Rule 10b–5.

In addition to plaintiffs failure to demonstrate either a duty or a failure to disclose, their 10b–5 claim is further deficient for the reason that the range company stock was not a security within the meaning of the Securities and Exchange Act of 1934.[11] This conclusion is based upon the characteristics of the stock, the Act's definition of a security, and the construction of that definition by the United States Supreme Court.

A share in the Sheep Company entitled its holder to graze five sheep upon the summer range for six months during grazing season, and five sheep upon the winter range for six months during the winter grazing season. Holders of Cattle Company stock were entitled to graze five head of cattle for six months during a normal year for each two shares of stock held. As previously noted, the Articles of Incorporation of each of the range corporations declared that the corporate purpose was to be the maintenance of a range for grazing, and incidentally thereto, to "construct, operate and maintain fences, corrals, sheds, barns and other fixtures. . . ." In addition, each states that the corporation is to be non-profit and that at least 85% of its income is to be "derived from assessments collected from the stockholders and shall be used for

---

bility of disposing of their shares at the price disclosed to them by the Bank.

**8.** Aside from the fact that the Bank informed the beneficiaries that their share would likely be purchased by the Ute Tribe, it was common knowledge that the Tribe was interested in purchasing a controlling interest in the range corporations. *See e. g.* Plaintiffs Ex. 324. At one point prior to the Bank's offer, the mixed-bloods considered selling all of the rangelands held by the corporation to the Ute Tribe, and ballots were sent to eligible AUC voters to determine their preference in this regard.

**9.** *See* Minutes, Affiliated Ute Citizens Board of Directors, September 19, 1960.

**10.** According to Department of Interior Regulations, each offer of sale was required to be posted conspicuously, for a period of at least 10 days in the Uintah and Ouray Agency Office at Fort Duchesne, and in the Post Offices of the towns of Roosevelt, Whiterocks, Randelett, Myton and Fort Duchesne. 25 C.F.R. § 243.6.

**11.** 15 U.S.C. § 78a et seq.

the sole purpose of meeting such expenses or losses that may be incurred by the corporation."

Section 3(a)(10) of the Securities Act of 1934,[12] defines a "security" as "any note, stock, treasury stock, bond, debenture, certificate of interest, or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit, for a security, or in general, any instrument commonly known as a 'security'; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited." Plaintiff contends that this broad definition embraces the range company stock in at least two of its categories; in plaintiffs view the stock is both an investment control and an instrument commonly known as a "security". The court recognizes that instruments may be included within the definition of a "security", "if on their face they answer to the name or description." *S. E. C. v. Joiner Corp.*, 320 U.S. 344, 351, 64 S.Ct. 120, 123, 88 L.Ed. 88 (1943). Finally, plaintiff argues that the United States Supreme Court, in *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972) collaterally estopped the defendant from denying that the range company stock is a "security" when it held that Bank employees violated Rule 10b–5 when they made a market in the stock of the Ute Distribution Corporation.

Section 3(a)(10) lists several terms in its attempt to embrace the full range of commercial forms which are, in concept, securities. *See* H.R.Rep.No.85, 73rd Cong., 1st Sess., 11 (1933). Some are specific and addressed to instruments generally recognized and of common usage. Others are more general and designed to include more novel types. None of these terms is itself defined, so that on its face, the definition does not contour the "concept of a security." The United States Supreme Court has provided illumination. In *Securities and Exchange Commission v. W. J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), the court considered a plan whereby investors were offered the opportunity to purchase plots of land in the seller's citrus groves. For a cost-plus fee, the seller would cultivate, harvest and market the crop grown on the buyer's plot. The profits were then pooled and distributed to the investors in proportion to the size of the holdings of each. The court characterized the issue before it as that of determining whether "the land sales contract, the warranty deed and the service contract together[13] constitute[d] an 'investment contract' within the meaning of § 2(1) and thus requiring registration under the 1933 Act." *Id.* at 297, 66 S.Ct. at 1102. The court held that the transaction was in fact an investment contract under the following test:

> "... ... an investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party ...." 328 U.S. at 298–299, 66 S.Ct. at 1102–1103.

Later, in *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975), the court declined to draw a distinction between an "investment contract" and "an instrument commonly known as a security" and suggested that the *Howey* test is essential to any inquiry

---

**12.** 15 U.S.C. § 78c(a)(10).

**13.** The definition of a security in § 2(1) of the Securities Act of 1933, 15 U.S.C. § 77b(1), is virtually identical to that contained in

§ 3(a)(10) of the 1934 Act and may be considered the same. *See United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 847 n. 12, 95 S.Ct. 2051, 2058 n. 12, 44 L.Ed.2d 621 (1975).

into the existence of a security, irrespective of the form of the transaction at issue. *Id.* at 852, 95 S.Ct. at 2060. *See also International Board of Teamsters v. Daniel*, 439 U.S. 551, 558 n. 11, 99 S.Ct. 790, 796 n. 11, 58 L.Ed.2d 808 (1979).

This is a sensible approach to the application of § 3(a)(10) and is adopted here. If, as the Supreme Court has reiterated, "that in searching for the meaning and scope of the word 'security' in the Act, form should be disregarded for substance and the emphasis should be on economic reality", *Tcherepnin v. Knight*, 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967), it should generally be of no moment which of the forms listed in § 3(a)(10) a transaction most closely resembles. The *Howey* test capably exposes the economic reality necessary to determine whether any form of transaction falls within the Act's definition of a "security".

Applying *Howey* to the range company shares, it would seem that the first requirement is met. It can be said that each mixed-blood "invested" in the range companies by foregoing his or her right to an undivided interest in the range land in return for shares. However, the only enterprise which could produce a profit was that carried on by those individual mixed-bloods who utilized the land for grazing their livestock or who leased their shares to other mixed-bloods. The range companies' sole charge to maintain and improve the range lands resulted in no profit to the corporations, but merely facilitated the shareholders use of the land. Under their articles, the corporations were to be non-profit. Shareholders could expect no distributions from them; only assessments. Plaintiffs observe that many of the shareholders did not wish to graze livestock and anticipated converting their shares to cash in the market existing among those shareholders actively engaged in grazing. Thus, in plain-

tiffs view, those shareholders relied upon the efforts of the range companies to efficiently maintain the land and to thereby enhance the value of their shares in that market. While it is true that many of the mixed-bloods desired to cash out of the corporations, any enhancement of the value of their shares by virtue of the corporation's maintenance of the range would have merely been incidental to the purpose of maintaining the range. Nor would such "profit" have borne any relation to a "common enterprise", since the corporation received no revenue from managing the land. Moreover, there is no evidence that it was ever represented to shareholders that they could expect profit from the sale of their shares because of range management, *see Aldrich v. McCulloch Properties, Inc.*, 627 F.2d 1036 (10th Cir. 1980), or that such management in fact increased the value of the shares.

Plaintiffs also argue that the California Supreme Court case of *Silver Hills Country Club v. Sobieski*, 55 Cal.2d 811, 13 Cal.Rptr. 186, 361 P.2d 906 (1961) held that shares in non-profit corporations are "securities". The so-called "risks capital" approach applied in that case, which construed California securities law, has not been adopted by either the Supreme Court[14] or the Tenth Circuit. Nonetheless, it articulated no *per se* rule as to non-profit corporations[15] and has no application here. The plaintiffs here did not invest "risk capital". The range companies were not risk ventures, there was no deal to go "sour". Rather, the shareholders merely exchanged their land for the right to use it in a particular way. They could either exercise that right or sell it. In short, the range company shares were not "securities" within the meaning of *Howey*. Moreover, the mixed-bloods' exchange of their land for stock in the range corporations was not the typical securities transaction to which the federal securities

---

14. *See United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 857 n. 24, 95 S.Ct. 2051, 2063 n. 24, 44 L.Ed.2d 621 (1975).

15. In *Silver Hills*, investors purchased memberships in a country club to be developed by the promoters. Members were not to be permitted

to share in the profits, but would have only the right to use the facilities once they were completed. The venture was expected to result in profit for the promoters; it was only the members who could expect no profit in the traditional sense.

laws are directed. Individual mixed-bloods had no investment decision relative to the exchange of their land once the Plan for Distribution had been adopted by them collectively and approved by the Commissioner of the Bureau of Indian Affairs. Indeed, the United States issued the patents directly to the range corporations. Thus, the uncertainty attended to normal securities transactions, and which the securities laws are designed to ameliorate, was not present. Nor was it present when the shareholders were confronted with decisions relative to the buying and selling of their shares after their initial "investment". Those decisions were not based on predictions of the success of the corporate venture; there was no relevant corporate venture. Rather, it was based only on what the right to graze a limited number of livestock was worth to them. The range corporations really represented nothing more than an effort to hold and define the individual use of range lands collectively owned by the mixed-bloods.

■ Finally, as to plaintiffs' claim of collateral estoppel, it is clear that the decision in *Affiliated Ute, supra,* does not estop the Bank from denying that the range company stock is a security within the meaning of § 3(a)(10). Whether or not the decision in *Affiliated Ute* could have collateral estoppel effect, the Court in that case adjudicated nothing relative to the range company shares. And, aside from the lack of identity of issues, that decision provides no support for any conclusion as to the nature of the shares at issue here. In *Affiliated Ute,* the court held that employees of the First Security Bank, which was a transfer agent for stock in the Ute Distribution Corporation, violated Rule 10b–5 when they encouraged a market in that stock among non-Indians and failed to disclose material information to mixed-blood sellers. The court was not presented in that case with the issue of whether or not the stock at issue *here* was a security.

The Ute Distribution Corporation, like the range corporations, was formed in order to effect a distribution of assets to individual mixed-bloods. Its stated purpose was "to manage jointly with the Tribal Business Committee of the full-blood members of the Ute Indian Tribe ... all unadjudicated or unliquidated claims against the United States, all gas, oil, and mineral rights of every kind, and all other assets not susceptible to equitable and practicable distribution to which the mixed-blood members of the said tribe ... are now, or may hereafter become entitled ... and to receive the proceeds therefrom and to distribute the same to the stockholders of this corporation ...."

Unlike the shareholders in the range corporations, the shareholders of the Ute Distribution Corporation looked to the managerial efforts of others to accumulate profits and distribute them. The decision in *Affiliated Ute* is irrelevant to the issue of the existence of a security here.

B. Breach of Fiduciary Duty

■ As to the plaintiffs' claim that the Bank's sale of the stock constituted a breach of trust, the only issue really in need of resolution is the adequacy of the price offered. Plaintiffs claim that the sale to the tribe was, in and of itself, a breach of trust. The evidence does not support that conclusion. Although plaintiffs characterize the efforts of the tribe to re-acquire the range lands in terms of what the Bank "must have known", or "should have known", it is fairly certain that the Bank knew that the tribe wanted control, had the authorization of the United States to acquire control, and that Interior and B.I.A. interpretations of the Termination Act and the regulations promulgated thereunder cleared the way for the acquisition of control. While it is not clear that the Termination Act contemplated that the tribe could act collectively to acquire real property distributed to the mixed-bloods, it clearly contemplated that range shares could fall into the hands of individual full-bloods, or members of the public if such were willing to pay in excess of what members of tribe would pay. Moreover, the shares were a non-liquid asset, actually income-depleting in view of the fact that they were subject

to periodic assessment. The evidence shows that the trust beneficiaries, and the mixed-bloods in general, were in need of cash. In retrospect, the sale itself was not an imprudent one.

The claims of the plaintiffs regarding the inadequate price are really two in number, they claim that reliance by the Bank on the Moore appraisal was misplaced, and that the Bank should have tested the market in order to get the best price obtainable for the shares.

### C. The Moore Appraisal

The "Moore appraisal", undertaken in 1958 by Frank Moore, a B.I.A. appraiser, commissioned by the A.U.C., placed a dollar amount on range lands distributed to the mixed-bloods, including the land which essentially became assets of the range corporations. The 172,000 acres of land which went into the corporations had a value, based on the Moore appraisal, of $492,000, each corporation receiving land, although in different quantities, of the same value, i. e. $246,000. The book value of each share worked out to be roughly $500. Plaintiffs claim that the "Moore appraisal" was not intended to place a fair market value on the range lands, but to arrive at a value index, in order that a one-on-one relationship between shares of stock in each of the corporations might be maintained. Plaintiffs arguments in that regard are unpersuasive. The appraisal on its face indicates that its purpose was "to estimate the fair market value for the surface right for the subject property". The overwhelming weight of the evidence indicates that Mr. Moore, the B.I.A., the Bank, the mixed-bloods and the tribe viewed it as establishing the value of the land. Moreover, it appears that the Bank was justified in relying on the appraisal. The appraisal was a conscientious one. Mr. Moore testified that he spent 16 days physically on the land and another 30 days examining comparable sales. Although plaintiffs claim that the Bank

should have undertaken an independent appraisal of the land, the Bank's reliance on the Moore appraisal was not a breach of its fiduciary duty. While a new appraisal might have fine-tuned the value of the land in view of the lapse of two years between the appraisal and the sale of the stock, it does not appear that the Bank's decision to offer the stock at 10% over its 1958 appraised value was unreasonable in view of the expense to the trust of a second undertaking and its ability to use the 1958 base to project 1960 values.

The plaintiffs also contend that the range lands carried with them hunting, fishing, water and timber rights not taken into consideration in the Moore appraisal, or reflected in the price at which the stock was sold. Plaintiffs do not appear to allege that the Bank wrongfully disregarded these "intangible rights" when it sold the stock, but assert them as an element of damage. It is clear from the record that the trustee Bank did not consider anything more than the surface rights to the range lands when it set the price for the shares. If these "intangible rights" ran with the land, and if the Bank was charged with knowledge of that fact, plaintiffs possess a colorable claim against the Bank.[16] However, plaintiffs fail in their burden to establish that these rights were appurtenant to the range lands, or that they were deprived of them by virtue of their sale of the range stock.

In support of their contention that these intangible rights were appurtenant to the range land, plaintiffs rely exclusively on the decision of the Court of Claims in the case of *Affiliated Ute Citizens v. United States*, (No. 156–69 Appendix A, Ct. of Claims, 1977). That case arose when the United States allegedly claimed absolute title to the water, timber and game rights on lands which included those placed in the range corporations. The A.U.C. argued before the Court of Claims that the United States breached its duty to the mixed-bloods when it allegedly failed to distribute such rights

---

**16.** On its face, the transaction between the tribe and the Bank involved only shares. These shares only permit the holder to graze stock on

the range lands. The sale of the shares is not the same as the sale of the underlying assets.

to them. As to these, the issue confronting the Court of Claims was whether the action was barred by the statute of limitations. If the "intangible rights" had been distributed to the mixed-bloods in 1961, the A.U.C. claim was untimely as the United States' duty to the mixed-bloods ended, in the view of the court, when all the assets were divided. The court held that the claim was in fact time-barred, stating that the "division and distribution of assets . . . were effected by 1961, all intangible assets being conveyed either in the form of shares in the Ute Distribution Corporation (U.D.C.) or as appurtenant to land . . . ." *Id.* at A–2. From this decision, plaintiffs reason that the Court of Claims held that the intangible rights ran with the range land and were lost with the sale of the land. However, such reliance is insufficient to sustain their burden in this instance. First, the Bank, and this court, are not bound by the decision in the Court of Claims. At most it is *stare decisis.* Moreover, the Court of Claims held only that the intangible rights were in fact distributed, either by appurtenance to the land or to the U.D.S. It is not clear from the record before this court where they went if they were distributed at all. The Termination Act required that all "assets not susceptible to equitable distribution and practicable distribution shall be managed jointly by the Tribal Business Committee and the authorized representative of the mixed-blood group,"[17] i. e. the U.D.C. At the least, the water and timber rights were arguably unsusceptible to practicable distribution. Moreover, the articles of incorporation of the range corporations make no reference to the intangible rights and thus do not empower the corporation to develop them for the benefit of the shareholders. Indeed, the shareholders would expect no distribution of any kind from the range corporations. Consequently, the decision of the Court of Claims does not demonstrate by a preponderance of the evidence that the intangible assets underlay the shares of stock in the range corporations.

### D. Failure to Test the Market

The plaintiffs are on somewhat more solid ground in their claim that the Bank failed to ensure that they obtained the best price possible for the shares. They claim the Bank should have ascertained prior to its offer, the maximum Mrs. Sprouse, for instance, would have paid. There is evidence which indicates that Mrs. Sprouse was willing to pay as much as $1,500 a unit, and had the resources available to accomplish the purchase of a controlling interest in the corporations. Although the Department of Interior invalidated Mrs. Sprouse's initial offer, that did not preclude her purchase of shares after an offer had been made to the qualified Indian offerees and remained unaccepted by them. It is conceivable that the Bank could have secured a better price for the shares had it initially offered the stock at a higher price. In that event, if the tribe did not accept the offer, Mrs. Sprouse or another may have done so. If neither the tribe nor Mrs. Sprouse were willing to purchase, then the price could have been adjusted downward.

In retrospect, the initial procedure followed by the Bank seems hurried, but not a breach of trust. At the time of the trustee Bank's offer to sell for $1,100 per unit, there is insufficient evidence that anyone other than Mrs. Sprouse could, or was willing to compete with the tribe in the purchase. Mrs. Sprouse, at the time of the Bank's offer, was an eligible purchaser so far as the trustee Bank knew. If both she and the tribe accepted the trustee Bank's offer, the trustee Bank had every reason to expect that the sealed-bid procedures[18] would enable it to secure a competitive price. When the Department of Interior invalidated Mrs. Sprouse's acceptance, post-acceptance competition among purchasers was extinguished and the trustee Bank was bound to convey to the remaining acceptor, the tribe. That the trustee Bank chose to obtain a competitive price by means of the sealed bid procedure, rather than by setting

---

17. 25 U.S.C. § 677i.

18. *See* 25 C.F.R. § 243.7.

a high price at the outset was in retrospect, a poorer procedure. But, in the absence of evidence of other serious prospective purchasers and because the Bank could reasonably rely on the Moore appraisal in fixing the sale price, there was no breach of fiduciary duty to the trust beneficiaries.

## III. STATUTES OF LIMITATION

■ Plaintiffs filed their complaint on July 17, 1975. By March 9, 1961, the trustee Bank had completed the block sale of 147 units to the tribe. By May of 1963, the tribe had purchased substantially all of the shares initially held by the mixed-bloods. In Utah, a claim arising under Rule 10b–5 must be brought within three years of the occurrence of the fraud.[19] The maximum limitation period relevant to plaintiffs' pendent claims is four years.[20] On its face, then, plaintiffs' complaint was untimely filed and it is plaintiffs' burden to demonstrate the existence of circumstances that would toll the limitation period. Plaintiffs attempt to meet this burden is three pronged; they allege that they didn't know; that they didn't have reason to know; and that the Bank is estopped from denying that they knew or had notice of the Bank's acts that would have been sufficient to put them on notice of their claims against the Bank.

### A. Plaintiffs' Knowledge

The major contention of the plaintiffs is that the trustee Bank conspired with the tribe in order to secure for the tribe its control of the range corporations shares at an inadequate price. By 1961, the plaintiffs knew that the Bank had sold the stock which it held in trust to the tribe for $1,100

per unit. They knew or should have known prior to that time that the tribe was desirous of acquiring, and was authorized by the B.I.A. to acquire control of the range lands. By early 1965, at the very latest, they knew or should have known that the tribe, by then long a majority holder of the range corporation's stock, intended to dissolve the corporations. Viewing the evidence in the light most favorable to the plaintiffs, it appears that their argument is that the Bank failed to inform plaintiffs that the Bank's actions violated the securities laws and the Bank's fiduciary duty.

Moreover, in March of 1969, six years prior to instituting the instant action, the plaintiffs[21] filed suit against the United States in the Court of Claims alleging *inter alia*, that the United States breached its duty to the mixed-bloods by failing to afford them counsel independent of the tribe and that they

> were individually deprived of their interests in various allotted lands and animal and grazing rights which said counsel with the approval, consent, and authorization of the United States, caused or permitted them to convey to said tribe without adequately advising of their rights or requiring the payment of adequate compensation for said lands and animal and grazing rights. (Petition, para. 12)

If the trust beneficiaries in 1969 were of the belief that they had been deprived of the rights when the stock was sold, and knew that the trustee Bank charged to secure their best interests, had sold the stock, it is difficult to conceive of what they knew in 1972 and thereafter that they didn't know in 1969.[22]

---

**19.** By reference to § 78–12–26(3), Utah Code Annotated (1953) (actions based on fraud or mistake) *See Esplin v. Hirschi*, 402 F.2d 94 (10th Cir. 1968), *cert. denied*, 394 U.S. 928, 89 S.Ct. 1194, 22 L.Ed.2d 459 (1969).

**20.** The action based upon breach of statutory fiduciary duty has a limitation period of three years. § 78–12–26(4), Utah Code Annotated (1953). Defendants positions and the plaintiffs do not dispute that the action based upon the breach of common law fiduciary duty has a

limitation period of four years. However, it is not clear that the common law claim is an "action not otherwise provided for by law" within the meaning of § 78–12–25's four-year period.

**21.** The A.U.C. brought the action as the authorized representative of the mixed-blood group.

**22.** Plaintiffs argue that the Court of Claims action is irrelevant to the question of what they knew and should have known about the activi-

## B. Collateral Estoppel

Next, plaintiff contends that defendant is precluded by the doctrine of collateral estoppel to assert that plaintiffs knew or should have known of the alleged fraud prior to April of 1972. In support of this assertion, plaintiff maintains that another judge held, in the case of *Miera v. First Security Bank of Utah*, (C–126–73, D.Utah), a case yet pending before this court, that the plaintiffs in that case, virtually identical to plaintiffs here, could not have known of the fraud alleged in *Miera* until the United States Supreme Court rendered its decision in *Affiliated Ute, supra*; and for a reasonable time thereafter.

The *Miera* case, like the *Affiliated Ute* case, and unlike this case, involves a claim that the Bank, while acting as transfer agent in the sale of stock in the Ute Distribution Company, engaged in market-making activities with respect to that stock, and by way of material misrepresentations and omissions, induced certain mixed-bloods to sell their shares at an inadequate price. It is clear from the record in *Miera* that the presiding judge made no "holding" to the effect that it was only the Supreme Court decision that could have imparted notice to the plaintiffs in *Miera* of the fraud alleged there.[23] However, even if it had been so held, and even if it could be said that only a

ties of the Bank. They first contend that the individual mixed-bloods were not parties to the action, but only the A.U.C. in its representative capacity. Thus the action did not necessarily impart notice to the individual plaintiffs here. This argument fails for a number of reasons. (1) The A.U.C. asserted the rights of the individuals when it claimed that the mixed-bloods were damaged by the sale of the range shares. The A.U.C. as an entity suffered no damage as a result of the sale. (2) Counsel for plaintiffs in this action was counsel for the A.U.C. in the Court of Claims proceedings. (3) The evidence does not support the conclusion that the individual members were in fact unaware of the nature of the claims presented to the Court of Claims. (4) Even if the individual mixed-bloods or some of them were in fact unaware of the Court of Claims action, the facts upon which the Court of Claims action was based were available to them and notice thus charged to them.

Plaintiffs also contend that their claim before the Court of Claims that they are deprived of their interests in "animal and grazing rights" when they "conveyed" them to the tribe refers to the initial division of assets between the mixed-bloods and full-bloods, not to the sale of the range shares. It is difficult to conceive that during the division of tribal assets, where title to assets retained by the tribe (full-bloods) remained in the United States, such could be termed a conveyance by the mixed-bloods to the tribe. Moreover, in 1970, in answers to interrogatories propounded by the United States, in the case before the Court of Claims, counsel for the A.U.C. stated

> Each and every member of plaintiff A.U.C. ... was deprived of grazing rights ... by the manner in which his grazing rights were "purchased" by the tribe. The tribe purchased all of the grazing rights from the individual plaintiffs.... The defendant advised the plaintiffs that the purchase price was fair and equitable and had been deter-

mined by independent appraisal.... Plaintiffs ... believe ... and ... allege that the price they received for their grazing rights and stock in the two grazing corporations ... was grossly inadequate, to their very substantial individual loss and damage.

Finally, it is plaintiffs' contention in this case that the Court of Claims, when it dismissed their suit as untimely filed, implicitly determined that the water, hunting, fishing and timber rights were appurtenant to the land distributed to the mixed-bloods. They thus rely on that dismissal as proof that those intangible rights were appurtenant to the range shares and added to their injury when the shares were sold. See 552 *infra*. That position is inconsistent with their argument that the only injury alleged by the A.U.C. in the suit before the Court of Claims surrounded the division of tribal assets. There can be little doubt but that the A.U.C. urged to the Court of Claims that the mixed-bloods suffered injury by virtue of the sale of the range company shares. Plaintiffs also suggest that prior to the Court of Claims decision in 1972, they were of the belief that it was the United States who deprived them of their rights in the intangibles by their failure to distribute them. It was only when they allegedly "learned" from the Court of Claims that all such assets had been distributed to them, that they became aware that the Bank, not the United States, had defrauded them. This argument is specious. Ignorance of the legal character of the Bank's activities does not toll the statute of limitations. Moreover, plaintiffs do not allege that the Bank knew or should have known of the alleged appurtenance of the intangibles.

**23.** In the *Miera* plaintiffs' memorandum of October 2, 1973, it is stated that the judge presiding over the case "expressed the tentative conclusion at the hearing on July 26, 1973 that these plaintiffs were not reasonably charged

decision by the highest court in the land was sufficient to impart notice of the claim alleged in *Miera*, such holding would be of no avail to plaintiffs in this case. First, to decide that the plaintiffs in *Miera* were unaware of their claim against the Bank for activities surrounding the transfer of U.D.C. stock is not to decide that the plaintiffs in this case were concurrently unaware of this claim against the Bank for activities surrounding the sale of stock in the range corporations. There is no identity of issues. Second, any order so far entered in *Miera* can have no collateral effect for the reason that no final judgment has been entered in that case.[24] Each case is to be decided on its own merits.

### C. Legal Incapacity Imparted to Minor Beneficiaries

■ By its terms, the trust relationship between the Bank and a minor beneficiary ended when the minor attained the age of 21. As to those beneficiaries who reached the age of 21 beyond the period of the statute of limitations, their claims are time-barred. Thirty-four of the beneficiaries whose stock was sold by the trustee Bank did not attain their majority until after the beginning of the four-year period prior to the filing of this action. Plaintiffs contend that the limitation period was tolled during the minority of these 34 beneficiaries and thus the statute of limitation is inapplicable. Defendants contend that by virtue of a *1968* agreement entered into between the A.U.C. and counsel who represented it in the Court of Claims and before this court, whereby said counsel and another attorney agreed to act as exclusive legal counsel for the A.U.C. for a period of ten years, the knowledge of counsel in the case was imputed to the minors irrespective of their minority.

Section 78–12–36 Utah Code Annotated (1953) states as follows:

> with notice of their claims until after the Supreme Court decision on April 14, 1972". No ruling resulted from that hearing. At most, the "tentative conclusion" was a remark.

**24.** *See* Rule 54(b), Federal Rules of Civil Procedure; *United States v. Young*, (slip op.) (No. 79–2101, 10th Cir., 1980).

> Effect of disability.—If a person entitled to bring an action, other than for the recovery of real property, is at the time the cause of action accrued, either:
>
> (1) Under the age of majority; or,
>
> (2) Mentally incompetent and without a legal guardian; or
>
> (3) Imprisoned on a criminal charge, or in execution under the sentence of a criminal court, for a term less than for life;—
>
> The time of such disability is not a part of the time limited for the commencement of the action.

No mention is made in the statute of circumstances where tolling does not occur if a person is under the age of majority. Defendant suggests it does not occur if a guardian is appointed or parents are available to actively pursue a claim, citing *Greenhalgh v. Payson City*, 530 P.2d 799 (Utah 1975) and *Forrer v. Reed*, 560 P.2d 1113 (Utah 1977). The cases cited are, at best, peripheral. The *Greenhalgh*[25] case, recognized as a matter of state policy, the priority of notice requirements over disability status where a minor had parents available to actively pursue a claim against the state; *Forrer* merely recognizes but did not hold that some courts have said that statute of limitations begins to run when *a guardian is appointed; Forrer* refers to *Jenkins v. Jensen*, 24 Utah 108, 66 P. 773 (1901); which is of no help here. That case held that where a trustee who has a sole right to bring an action is time-barred, the beneficiaries are time-barred. Here, of course, the beneficiaries are suing the trustee and the claims are not just pendent state claims but federal claims as well.

At best, there remain 34 minor beneficiaries represented by plaintiff, *not expressly*

**25.** The holding on the main issue in *Greenhalgh* has been legislatively overruled. *Standiford v. Salt Lake City Corp.*, 605 P.2d 1230, 1232 n. 1 (Utah 1980).

time-barred by the applicable statute of limitations when considered in relationship to § 78–12–36, Utah Code Annotated, (1953). As to them, the statute of limitations may well have tolled. At this juncture, I need not decide that question either as a matter of state law nor as a matter of federal law in view of the fact that we have dealt with the substantive questions presented in this case on their merits.

## IV. THE CLAIM COMMON TO THE ADULTS AND BENEFICIARIES

 In this sixth cause of action, plaintiffs represent the entire mixed-blood group, trust beneficiaries and non-beneficiaries, and claim that the Bank conspired with the tribe and others to deprive the mixed-bloods of their rights, and aided and abetted the tribe in a scheme to obtain the shares in violation of Rule 10b–5, and breached a fiduciary duty to the adults. The first two of these claims can summarily be disposed of. As to the claim of conspiracy, there was no unlawful object. There was nothing *per se* unlawful about the tribe's acquisition of the range shares. And while plaintiffs claim that the unlawful object was the failure to inform the mixed-bloods of the tribe's design, the evidence indicates that the tribe was open in its attempt to acquire a majority interest in the range corporations. Knowledge of that end was pervasive.

Regarding the claim of aiding and abetting, the necessary element of a Rule 10b–5 violation on the part of the tribe is absent. The tribe merely accepted the mixed-bloods offers to sell, and never attempted to conceal its intent to acquire the range shares. Moreover, there was no security involved and thus there could then be no violation of Rule 10b–5.

As to plaintiffs claim that the Bank owed a fiduciary duty to mixed-bloods who were *not* trust beneficiaries, the evidence discloses no such a duty. The plaintiffs would infer a duty from the Bank's role as transfer agent of the range company stock. Such did not impose a duty to disclose nor did the Bank undertake to advise the adults as to the sales of their shares or the price thereof in any meaningful way. It was the mixed-bloods themselves who decided to sell and made the offers of sale. Also, the failure of certain of the trust beneficiaries to overcome their burden of establishing that the statute of limitations was tolled is common to the adults. In short, the claims of the adults, if any, are time-barred.

I have examined the claims relating to trustee Bank's failure to exercise its re-purchase option and the reasons set forth for electing not to do so appear reasonable and unactionable under the circumstances. Certainly, such in no sense taints the sale by trustee Bank of 147 share units in a block to the Ute Indian Tribe.

The proxy and tender offer claims are without merit.

The role of the attorney for the Ute Indian Tribe is referred to. I merely note that he is not a party to this action.

This memorandum opinion shall constitute the Findings of Fact and Conclusions of Law in this matter.

The complaint should be dismissed and judgment entered in favor of defendant and against plaintiffs.